**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALISON CAMM**, **NICOLE FLICK, NORMA CISNEROS**, and **KRYSTAL FORBES**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**REACH FINANCIAL, LLC**,<br><br>Defendant. | Case No. 1:25-cv-01921-KPF<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Alison Camm, Nicole Flick, Norma Cisneros, and Krystal Forbes, (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendant Reach Financial, LLC ("Reach Financial" or "Defendant"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. It is natural for people to want to keep their finances private, especially when they are struggling to repay debts. The unwanted disclosure of such information can be enormously harmful. It can impact an individual's reputation, livelihood, and personal relationships.

2. Many companies, like Defendant, specialize in helping people get out of trouble with debt. To assist a debtor, the companies need significant amounts of information about the person's finances. Most people who apply for these companies' services assume that they will do

its utmost to keep that information private.

3. Unfortunately, unbeknownst to Plaintiffs and other visitors to Defendant's website, Defendant does not keep sensitive information about its visitors private. Instead, Defendant collects and transmits the fact that users of its website to third party advertisers. This information includes details about who is applying for a debt consolidation loan, and whether that loan was approved or denied (collectively, the "Sensitive Information") about the users on its website to third parties, including Alphabet Inc. ("Google"), through its use of surreptitious online tracking tools.

4. Online advertising giants, like Google, try to compile as much information as possible about American consumers, including the most private aspects of their lives, as fuel for a massive, targeted advertising enterprise. Any information about a person captured by those online behemoths can be used to stream ads to that person. If Google receives information that a person is struggling with unpaid debt, it will use that information, and allow its clients to use that information, to stream ads to that person's computers and smartphones relating to debt relief products and services.

5. Google offers website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information

provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

7. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their customers' privacy.

8. Defendant, Reach Financial, chose to accept the devil's bargain offered by Google by installing Google's Tracking Tools on its website. In doing so, it has chosen to prioritize marketing over customer privacy.

9. Reach Financial is a debt relief company that claims to "help people outsmart debt for good[,]" including through its debt consolidation loan program.[1] According to its website, Defendant has helped its customers pay off $1-billion in unpaid debt.[2]

10. Defendant's website – www.reach.com (the "Website") – allows potential customers to fill out an application for its debt consolidation loans and receive an instant determination on whether their application has been accepted. Each of the Plaintiffs and Class Members visited the Website and had their personal Sensitive Information tracked by Defendant using the Tracking Tools.

11. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with

---

[1] *About Us*, REACH FINANCIAL, https://www.reach.com/corporate/about (last visited Feb. 1, 2025).
[2] *Id.*

online service providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages and (viii) continued and ongoing risk to their Sensitive Information.

12. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Negligence; violations of the California Invasion of Privacy Act ("CIPA"); Cal. Pen. Code § 360, *et seq*.

## II. PARTIES

***Plaintiff Alison Camm***

13. Plaintiff Alison Camm is a citizen of the state of California, residing in Placer County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

14. In or around January of 2025, Plaintiff Camm utilized Defendant's Website on her personal electronic device to apply for a debt consolidation loan.

15. Unbeknownst to Plaintiff Camm, The Tracking Tools contemporaneously transmitted to Google the Sensitive Information that was communicated to and from Plaintiff Camm as she used the Website, including the fact that her loan application was denied.

16. Plaintiff Camm never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties.

17. On every occasion that she visited Defendant's Website, Plaintiff Camm possessed an account with Google, and she accessed Defendant's Website while logged into her Google account on the same device.

18. After providing her Sensitive Information to Defendant through the Website,

Plaintiff Camm immediately began seeing targeted online advertisements for debt relief services.

***Plaintiff Nicole Flick***

19. Plaintiff Nicole Flick is a citizen of the state of California, residing in San Diego County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

20. In or around December of 2024, Plaintiff Flick utilized Defendant's Website on her personal electronic device to apply for a debt consolidation loan.

21. Unbeknownst to Plaintiff Flick, The Tracking Tools contemporaneously transmitted to Google the Sensitive Information that was communicated to and from Plaintiff Flick as she used the Website, including the fact that her loan application was denied.

22. Plaintiff Flick never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties.

23. On every occasion that she visited Defendant's Website, Plaintiff Flick possessed an account with Google, and she accessed Defendant's Website while logged into her Google account on the same device.

24. After providing her Sensitive Information to Defendant through the Website, Plaintiff Flick immediately began seeing targeted online advertisements for debt relief services.

***Plaintiff Norma Cisneros***

25. Plaintiff Norma Cisneros is a citizen of the state of Illinois, residing in McHenry County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

26. In or around October of 2024, Plaintiff Cisneros utilized Defendant's Website on her personal electronic devices to apply for a debt consolidation loan.

27. Unbeknownst to Plaintiff Cisneros, The Tracking Tools contemporaneously transmitted to Google the Sensitive Information that was communicated to and from Plaintiff Cisneros as she used the Website, including the fact that her loan application was denied.

28. Plaintiff Cisneros never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties.

29. On every occasion that she visited Defendant's Website, Plaintiff Cisneros possessed an account with Google, and she accessed Defendant's Website while logged into her Google account on the same device.

30. After providing her Sensitive Information to Defendant through the Website, Plaintiff Cisneros immediately began seeing targeted online advertisements for debt relief services.

***Plaintiff Krystal Forbes***

31. Plaintiff Krystal Forbes is a citizen of the state of Illinois, residing in McHenry County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

32. In or around October of 2024, Plaintiff Forbes utilized Defendant's Website on her personal electronic device to apply for a debt consolidation loan.

33. Unbeknownst to Plaintiff Forbes, The Tracking Tools contemporaneously transmitted the Sensitive Information that was communicated to and from Plaintiff Forbes as she used the Website to Google, including the fact that her loan application was denied.

34. Plaintiff Forbes never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties.

35. On every occasion that she visited Defendant's Website, Plaintiff Forbes possessed an account with Google, and she accessed Defendant's Website while logged into her Google account on the same device.

36. After providing her Sensitive Information to Defendant through the Website, Plaintiff Forbes immediately began seeing targeted online advertisements for debt relief services.

***Defendant Reach Financial***

37. Defendant Reach Financial, LLC is a limited liability corporation incorporated in Delaware with its principal place of business at 80 Maiden Lane, Suite 2801, New York, NY 10038, in New York County.

## III. JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

39. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

40. This Court has personal jurisdiction over Defendant because Defendant is incorporated and headquartered in this District, and because Defendant has advertised and sold its debt relief products to consumers in the State of New York and in this judicial district.

41. Personal jurisdiction is also proper because Defendant committed tortious acts in the State of New York and this judicial district and Plaintiffs' claims arise out of such acts, and/or because Defendant has otherwise made or established contacts in the State of New York and in this judicial district sufficient to permit the exercise of personal jurisdiction.

42. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### a. Google's Mass Advertising Surveillance Operation

43. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[3] In 2023, Google's advertising revenue of $238-billion accounted for 77-percent of its total revenue for the year.[4]

44. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[5] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[6]

45. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[7]

---

[3] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2 C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Feb. 1, 2025).

[4] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Feb. 1, 2025).

[5] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Feb. 1, 2025).

[6] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Feb. 1, 2025).

[7] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Feb. 1, 2025).

46. Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[8]

47. Even though Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendant was part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website

48. Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[9] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (*e.g.*, recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[10]

49. Google's surveillance of individual's internet usage is ubiquitous. In 2017,

---

[8] *Id.*

[9] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[10] *About audiencesegments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Feb. 1, 2025).

Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[11] and Google trackers are present on 74-percent of all web traffic.

50. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[12] In fact, Google advertising trackers were found on 73-percent of pornography websites.[13]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[14]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[15] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[16]

51. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We

---

[11] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Feb. 1, 2025).

[12] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[13] *Id.*

[14] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[15] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Feb. 1, 2025).

[16] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Feb. 1, 2025).

know where you've been. We can more or less know what you're thinking about."[17]

52. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[18]

53. When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network, and in return they benefit from Google's collection of user data, at the expense of their website users' privacy. For example, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[19]

**b. Pixels Can Record Almost Every Interaction Between a User and a Website**

54. In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto its website.

55. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[20]

---

[17] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Feb. 1, 2025).

[18] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Feb. 1, 2025) ("Google Analytics gives you the tools, free of charge"),

[19] *Google Marketing Platform– Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Feb. 1, 2025).

[20] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Feb. 1, 2025).

56. Pixels can collect a shocking amount of information regarding an internet user's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[21]

57. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[22]

**c. The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to Google**

58. Every website is hosted by a computer "server" that holds the website's contents.

59. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

60. Communications between a website server and web browser consist of "Requests"

[21] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Feb. 1, 2025); Tom Kemp, *"Oops! I Did ItAgain" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Feb. 1, 2025).

[22] *Lurking Beneath the Surface, supra* note 23.

and "Responses." Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

61. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[23] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[24] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[25]

62. When a Google user logs onto their account, their web browser records a Google tracking cookie.[26] This cookie includes a specific line of code that links the web browser to the user's Google account.[27]

63. Google's Pixels use cookies, but operate differently than cookies. Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

---

[23] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Feb. 1, 2025).
[24] *Id.*
[25] *Id.*
[26] Cyphers, *supra* note 9.
[27] *Id.*

64. Simultaneously, the Google Pixels, like those installed on Defendant's Website, request identifying information from any Google cookies previously installed on the user's web browser.

65. The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

66. A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[28] When these internet users visit a website, like Defendant's, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

67. However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

68. Google's Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

69. An internet user's combination of such device and browser characteristics,

---

[28] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Feb. 1, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Feb. 1, 2025).

commonly referred to as their "browser fingerprint," is "often unique."[29] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[30] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**d. Defendant Disclosed Plaintiffs' and Class Members' Sensitive Information to Google**

70. To apply for a debt consolidation loan from Defendant, Plaintiffs and Class Members were required to fill out an online loan application on Defendant's Website.

71. Unbeknownst to Plaintiffs and Class Members, Defendant intentionally configured the Google Pixels installed on its Website to capture and transmit the Sensitive Information that they communicated to Defendant while applying for a debt consolidation loan.

72. The below screenshot ("Figure 1") shows that the information requested and transmitted to Google by the Pixels installed on Defendant's Website includes the fact that the user "getting started" on a debt consolidation loan.

73. Further, the information transmitted to Google was accompanied by specific lines of code linking the Sensitive Information provided by Plaintiffs and Class Members to their identities. The following screenshot shows that the Google Pixel on Defendant's Website transmitted the identifier number attached to Google's 'cid' cookie, which identifies the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language preference, screen resolution, browser software and version, and operating system software and version.

[29] Cyphers, *supra* note 29.
[30] *Id.*




*Figure 1. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google when Website users fill out a debt consolidation loan application.*

74. After the user completes the loan application on Defendant's Website, they are provided with an instant determination on whether their loan application has been accepted or denied. As the following screenshot ("Figure 2") shows, Defendant's website transmits this determination – in this case, the fact that the application was "declined" – to Google, alongside the identifier number from Google's '_cid' cookie, which identifies the user's Google account, and other information that is commonly used to create a browser fingerprint, such as the user's language preference, screen resolution, browser software and version, and operating system software and version.




*Figure 2. Screenshot depicting back-end network traffic from Defendant's Website which shows information regarding a rejected loan application transmitted to Google.*

75. In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[31] Defendant purposely configured the Google Pixels on its Website to collect and transmit additional user data, including its determination of whether a user's loan application should be approved or denied.

76. By installing third-party Tracking Tools, including tracking Pixels, on its website, and by further configuring those Pixels to collect its Website users' Sensitive Information, Defendant knowingly and intentionally caused Plaintiffs' and Class Members' Sensitive Information to be transmitted to third parties, including Google.

[31] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Feb. 1, 2025).

## B. DEFENDANT DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

### a. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiffs and Class Members

77. The Tracking Tools installed on Defendant's Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by Defendant's Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on Defendant's Website.

78. Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Information would be disclosed to any unauthorized third party without their express consent.

79. Plaintiffs and Class Members did not know that their Sensitive Information was being collected and transmitted to an unauthorized third party.

80. Because Plaintiffs and Class Members were not aware of the Google Pixels on Defendant's website, or that their Sensitive Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### a. Defendant Received Material Benefits in Exchange for Plaintiffs' Sensitive Information

81. As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on their website.

82. Upon information and belief, Defendant, as a user of Google's Business Tools,

received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiffs' and Class Members' Sensitive Information.

**b. Plaintiffs' and Class Members' Data Had Financial Value**

83. Moreover, Plaintiffs' and Class Members' Sensitive Information had value, and Defendant's disclosure and interception of that Sensitive Information harmed Plaintiff and the Class.

84. According to the financial statements of Facebook, another major seller of online advertisements, the value derived from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[32]

85. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

86. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

87. The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

## D. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

[32] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Feb. 1, 2025).

88. At all times when Plaintiffs and Class Members provided their Sensitive Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Information with third parties for a commercial purpose, unrelated to processing their loan applications.

89. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

90. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[33]

91. Americans are particularly sensitive about disclosing their financial status. For example, 43-percent of Americans – including Americans who are not experiencing any financial hardship – report that they have either withheld financial information from their significant other or lied to their significant other about their financial information.[34] Moreover, studies have shown that financial hardship results in feelings of shame and guilt, and that those feelings intensify with the magnitude of an individual's financial struggles.[35]

92. Personal data privacy and obtaining consent to share Sensitive Information are

---

[33] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Feb. 1, 2025).

[34] Erin El Issa, *Many Americans Keep Financial Info Under Wraps From Partners and Parents*, NERDWALLET (June 27, 2024), https://www.nerdwallet.com/article/credit-cards/financial-secrets-survey-2023 (last visited Feb. 1, 2025).

[35] Joe J. Gladstone, Jon M. Jachimowicz, Adam Eric Greenberg & Adam D. Galinsky, *Financial shame spirals: How shame intensifies financial hardship*, 167 ORG. BEHAV. & HUM. DEC. PROCESSES 42 (2021), *available online at*: https://www.sciencedirect.com/science/article/abs/pii/S0749597821000662?via%3Dihub.

material to Plaintiffs and Class Members.

## V. TOLLING AND ESTOPPEL

93. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google's Tracking Tools into its website.

94. The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

95. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

96. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

97. Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by applying for loans through Defendant's Website, Plaintiffs' and Class Members' Sensitive Information would be disclosed or released to unauthorized third parties, including Google.

98. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Sensitive Information. In fact, Defendant still has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Sensitive Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

99. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

100. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this

Complaint.

## VI. CLASS ALLEGATIONS

101. This action is brought by the named Plaintiffs both individually, and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

102. The Class that Plaintiffs seek to represent is defined as follows:

**The Class**

All natural persons, excluding natural persons residing in California and Missouri, who used Defendant's Website to apply for a loan, and whose Sensitive Information was disclosed or transmitted to Google, or any other unauthorized third party.

103. In addition to the claims asserted on behalf of the Class, Plaintiffs assert claims on behalf of separate California and Illinois Subclasses, which are defined as follows:

**California Subclass**

All natural persons residing in California who used Defendant's Website to apply for a loan, and whose Sensitive Information was disclosed or transmitted to Google, or any other unauthorized third party.

**Illinois Subclass**

All natural persons residing in Illinois who used Defendant's Website to apply for a loan, and whose Sensitive Information was disclosed or transmitted to Google, or any other unauthorized third party.

104. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

105. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

106. **Numerosity.** The Class is so numerous that the individual joinder of all members

is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

107. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Sensitive Information of Plaintiffs and Class Members;

b) Whether Defendant had duties not to disclose the Sensitive Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

h) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Information.

108. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

109. **<u>Adequacy</u>.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

110. **<u>Predominance</u>**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, like Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

111. **<u>Superiority</u>.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

112. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-

wide basis.

113. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

c) Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Sensitive Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

114. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**NEGLIGENCE**
***(On Behalf of Plaintiffs and the Class or, alternatively, the Illinois Subclass)***

115. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 114 as if fully set forth herein.

116. Through using Defendant's Website, Plaintiffs and Class Members provided it with their Sensitive Information.

117. By collecting and storing data related to these applications, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

118. Defendant negligently, recklessly, and/or intentionally failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to Google.

119. Defendant further negligently, recklessly, and/or intentionally omitted to inform Plaintiff and the Class that it would use their Sensitive Information for marketing purposes, or that their Sensitive Information would be transmitted to third parties.

120. Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Information to Defendant, had Plaintiff and the Class known that Defendant intended to use that information for unlawful purposes.

121. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

122. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

123. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) cease collection and dissemination of its Website users' Sensitive Information to third parties; and (iii) submit to future

annual audits of those systems and monitoring procedures.

**COUNT II**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**
**Cal. Pen. Code § 630, *et seq.***
***(On Behalf of Plaintiffs Camm and Flick, and the California Subclass)***

124. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 123 as if fully set forth herein.

125. The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

126. Under CIPA, it is unlawful to:

a. "[W]illfully and ***without the consent of all parties to the communication***, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

b. "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

c. [A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

127. At all relevant times, Defendant aided, employed, agreed with, and conspired with Google, and likely other third parties, to track and intercept Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Google to eavesdrop on and intercept in real-time the content of intercept Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' private communications with Defendant.

128. The content of those conversations included Sensitive Information, including loan application determinations. Through Defendants' installation and configuration of the Tracking Tools on the Website, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff Camm, Plaintiff Flick, and California Subclass Members.

129. Defendants intentionally inserted an electronic device into their Website that, without the knowledge and consent of Plaintiff Camm, Plaintiff Flick and California Subclass Members, transmitted the substance of their confidential communications with Defendant to third parties.

130. Defendants willingly facilitated Google's and other third parties' interception and collection of Plaintiff's and California Subclass Members' Sensitive Information by embedding the Tracking Tools on the Website, thereby assisting Google's eavesdropping

131. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools falls under the broad catch-all category of "any other manner":

a. The computer codes and programs Google and other third parties used to track intercept Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' communications while they were navigating the Website;

b. Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' internet browsers;

c. Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' computing and mobile devices;

d. Google's web and ad servers;

e. The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google and other third parties to effectuate their tracking and interception of Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' communications while they were using a browser to visit the Website; and

132. As demonstrated hereinabove, Defendants violate CIPA by aiding and permitting third parties, including Google and their agents, employees, and contractors to receive Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' Sensitive Information in real time through the Website without their consent

133. By disclosing Plaintiff Camm's, Plaintiff Flick's, and California Subclass Members' Sensitive information, Defendants violated Plaintiff's and California Subclass Members' statutorily protected right to privacy.

134. As a result of Defendant's violation of the CIPA, Plaintiff Camm, Plaintiff Flick, and California Subclass Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of other Class Members, pray for judgment against Defendant as follows:

A. an Order certifying the Class, and California and Illinois Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded; and

G. all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: May 15, 2026

Respectfully submitted,

*/s/ Sonjay C. Singh*
Sonjay C. Singh (*pro hac vice*)
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, Maryland 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

*** *Additional Signatures on****
*Following Page*

Mason A. Barney (SDNY Bar #MB7225)
Alyssa Tolentino (SDNY Bar #6195481)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: atolentino@sirillp.com

***Attorneys for Plaintiffs and the Classes***